## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD GORDON, individually and on behalf of all others similarly situated,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **14 C 5848** |
| **v.** | ) ) | **Judge John Z. Lee** |
| **CARIBBEAN CRUISE LINE, INC., a Florida corporation,** | ) ) ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

On July 28, 2014, Plaintiff Richard Gordon received an unsolicited text message sent on behalf of Caribbean Cruise Line, Inc. ("CCL"). And so, Plaintiff filed suit against CCL, individually and on behalf of a putative class, alleging that CCL violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Plaintiff has filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3) [94]. For the reasons provided herein, the motion is denied.

### I. Procedural History

Three months before filing this case, Plaintiff's counsel had filed a similar case in the Eastern District of New York, *Jackson v. Caribbean Cruise Line, Inc.*, where another plaintiff filed a class action against CCL and its Canadian advertising agency, Adsource Marketing, Ltd. ("Adsource"), for violating the TCPA. Case No. 14-cv-02485-ADS-AKT (E.D.N.Y.), ECF No. 1. In *Jackson*, as in this case, the plaintiff alleged that CCL, through Adsource, sent unsolicited text messages to hundreds of

thousands of cell phone numbers. The Court stayed this case during the pendency of the *Jackson* litigation, and the parties, represented by the same counsel in both cases, agreed that discovery in *Jackson* would also apply here.

Discovery in *Jackson* took over two years. Having failed to answer the complaint, Adsource defaulted. *Id.*, ECF No. 89. Discovery of evidence from Adsource and its president, Benjamin Langille, who was then a Canadian resident, was pivotal to the plaintiff's claims against CCL in *Jackson*. Nonetheless, plaintiff's counsel made no formal attempt to obtain discovery from Adsource or Langille, despite the *Jackson* court's warning that foregoing such discovery could have fatal consequences. Plaintiff's counsel chose, instead, to rely on opposing counsel to gather information from Adsource.

Based upon this arrangement, CCL produced two lists obtained from Adsource containing information about various individuals, who (at least according to CCL and Adsource) had opted in and consented to receive text messages regarding CCL.[1] CCL also provided a privilege log that listed a curious document described as "Ben Langille Declaration," which CCL withheld based upon the attorney work product doctrine; Plaintiff's counsel did not challenge this designation. Two days before the close of discovery in *Jackson*, the plaintiff moved to voluntarily dismiss the case with prejudice, and the court granted the motion. Def.'s Resp. Pl.'s Mot. Exclude Langille Decl., Ex. P, Pl.'s Mot. Dismiss Pursuant to Rule 41, ECF No. 118-16.

---

[1]  For reasons too obvious to explain, CCL calls these lists "opt-in lists," while Plaintiff refers to them as "text lists." The Court will refer to them as the "Lead List" and "Second Lead List," respectively.

The resolution of *Jackson* prompted the restart of this case, and this Court permitted the parties to pursue additional discovery. Minute Entry of 2/22/17, ECF No. 60. At that time, Plaintiff's counsel indicated that he would not seek discovery from Langille or Adsource. Status Report at 4, ECF No. 61. Additionally, Plaintiff neither sought the production of the Langille declaration nor challenged its designation as attorney work product. Nor did Plaintiff ever seek leave to add Langille or Adsource as defendants in this case.

Plaintiff subsequently moved for class certification. In its opposition to the motion, CCL submitted Langille's declaration. Plaintiff moved to exclude the declaration under Federal Rule of Civil Procedure ("Rule") 37(c)(1), and the Court denied the motion on September 18, 2018, permitting CCL to rely upon Langille's declaration and finding that Plaintiff would not suffer any undue prejudice as a result. *See* Pl.'s Mot. Exclude, ECF No. 113; 9/18/18 Order, ECF No. 143.

## II. Factual Background

CCL is a marketer of cruise vacation packages, which include cruises, airline travel, hotel stays, and car rentals. Compl. ¶ 11, ECF No. 1; Pl.'s Ex. 1, Poole Dep. at 97, ECF No. 86-2. According to Jennifer Poole, CCL's Director of Marketing, CCL hired Langille and Adsource to generate sales leads of persons interested in purchasing vacation packages. Def.'s Ex. 3, Poole Decl. ("Poole Decl.") ¶¶ 5, 7, 9, ECF No. 105-3; Def.'s Ex. 4, Poole Dep. ("Poole Dep.") at 96:7–15, ECF No. 105-4.

To this end, Adsource's marketing program for CCL consisted of placing banner and pop-up advertisements on certain websites offering vacation deals. Poole

Decl. ¶ 9a.  If a person clicked on the advertisement, he or she would be directed to Adsource's website.  *Id.* ¶ 9b; *see* Pl.'s Ex. 2 (showing Adsource's landing page), ECF No. 94-3.  After the person was directed to Adsource's website, the person had the option of submitting his or her phone number, which served as consent to receive a subsequent telephone call or text message about the offer.  Poole Decl. ¶ 9b.  In doing so, the person was required to check a box next to the following statement: "By agreeing I consent to be called and/or texted by or on behalf of Caribbean Cruise Line via autodialer or prerecorded voice at the number above . . . .  My consent does not require purchase.  Standard cellular rates will apply."  Pl.'s Ex. 6, Pl.'s Dep. Ex. 4, ECF No. 86-7.

After the person provided a phone number, Adsource's toll-free number would appear on the screen.  Poole Decl. ¶ 9c.  When the person called Adsource, a representative would explain the vacation offer, and, if the caller wished to hear additional information, Adsource would transfer the call to a CCL representative.  *Id.* ¶ 9d.

Plaintiff disputes that CCL's marketing program worked in this way.  In support, Plaintiff asserts that he never visited Adsource's website, provided his phone number, or consented to receive text messages.  Nonetheless, according to Plaintiff, on July 28, 2014, he received a text message on his cell phone stating, "You've been sent a pair of zero cost tickets to the Bahamas! Call 813.5151805."  Compl., Ex. A, ECF No. 1; Pl.'s Ex. 6, Gordon Dep. ("Gordon Dep.") at 153:14–21, 190:6–8, ECF No.

86-7. Moreover, Plaintiff claims that hundreds of thousands of other consumers also received similar unsolicited text messages regarding CCL.

As part of his motion, Plaintiff has presented evidence that, throughout CCL's marketing relationship with Adsource, CCL was aware that people had complained about receiving unsolicited text messages. *See, e.g.*, 3/3/14 Email from J. Poole to B. Langille, CCL.022051(JAX); 5/13/14 Email from J. Poole to B. Langille, CCL.022185(JAX); 5/21/14 Email from J. Poole to B. Langille, CCL.022185(JAX); 10/21/14 Email from J. Poole to B. Langille, CCL.022068(JAX). Some, like Plaintiff, have filed lawsuits. *See, e.g., Jackson v. Caribbean Cruise Line, Inc.*, No. 2:14-cv-2485 (E.D.N.Y.) (filed Apr. 18, 2014); *Iosello v. Caribbean Cruise Line, Inc.*, No. 14 C 6118 (N.D. Ill.) (filed Aug. 8, 2014); *Izsak v. Caribbean Cruise Line, Inc.*, No. 14-cv-62231-BB (S.D. Fla.) (filed Sept. 29, 2014); *Guiley v. Caribbean Cruise Line Inc.*, No. 2014-CVI-1034 (Canton Ohio Mun. Ct.) (filed Feb. 20, 2014).

As a result, CCL has repeatedly requested that Langille provide CCL with a lists of consumers, who had consented to receive the text messages. Pl.'s Ex 2, 8/1/13 Email from J. Verillo to B. Langille, CCL.022069(JAX), ECF No. 94-2; *id.*, 3/1/14 Email from J. Poole to B. Langille, CCL.022052(JAX); *id.*, 3/26/14 Email from J. Poole to B. Langille, CCL.022167(JAX). During the many months that CCL waited for Langille to provide the lists, CCL and Adsource received hundreds of calls daily in response to the marketing program. *See id.*, 11/15/13 Email from J. Poole to B. Langille, CCL.022061(JAX); *see also* Pl.'s Ex. 15, CCL Call-Back List (showing roughly 190,000 calls to CCL between February 1, 2014, and February 23, 2015); *cf.*

ECF No. 94-2; Pl.'s Ex. 7, Lead List (showing 171,000 calls to Adsource from May 29, 2014, to February 9, 2015), ECF No. 94-2; Pl.'s Reply Ex. 1, Second Lead List (showing 136,000 calls to Adsource from November 12, 2013, to April 30, 2014), ECF No. 114-1.

In the end, Adsource produced two "Lead Lists" of people who had provided their contact information and had indicated their consent to receive text messages. *See* Pl.'s Ex. 7, Lead List (listing phone calls to Adsource from May 29, 2014, to February 9, 2015); Pl.'s Reply Ex. 1, Second Lead List, ECF No. 114-1 (listing phone calls to Adsource from November 12, 2013, to April 30, 2014); *see also* Def.'s Ex. 5, Langille Decl. ¶¶ 14–15, ECF No. 105-5. The information on the Lead Lists includes: (1) Adsource's identification number for each person, (2) the person's first and last name, (3) the phone number the person had provided on Adsource's website, (4) the URL of the Adsource website that the person had accessed, (5) the person's IP address, and (6) the date and time the person had called Adsource. It is unknown whether a person identified on the list contacted Adsource after obtaining the toll-free number from Adsource's website or in response to a voicemail message or text message. *See* Def.'s Ex. 5, Langille Decl. ¶¶ 6–7, 10–11.

Plaintiff credits some, but not all, of the information on the Lead Lists. To the extent that the Lead Lists contain an individual's phone number, Plaintiff believes that the phone number does accurately represent a person, who had received a text message from Adsource. To support this contention, Plaintiff states that his phone number appears on the first Lead List and that he had received a text message.

Gordon Dep. at 153:14–21, 190:6–8; Lead List, Lead 744436. Plaintiff also points to two plaintiffs in other cases, whose phone numbers appear on the Second Lead List and allegedly received CCL text messages. *See* Pl.'s Reply at 3–7.

Plaintiff also agrees with the veracity of the dates and times that appear on the Lead Lists that purport to show when a person called Adsource's toll-free number. He bases this assumption on the fact that the date and time associated with his phone number match his recollection of events. Lead List, Lead 744436; Gordon Dep. at 123:18–24, 154:5–155:9.

But Plaintiff argues that the names that appear on the Lead List are completely manufactured. For example, the Lead List records the person associated with Plaintiff's phone number as "Stephanie Byrd." Pl.'s Ex. 9, Gordon Aff. ¶¶ 4–6. Plaintiff attests that he does not know anyone by that name. *Id.* In addition, Plaintiff's counsel reviewed 50 phone numbers from the Lead List and, using public record searches, compared them to the subscribers who had those numbers at various points in time (although not necessarily during the time period recorded on the Lead Lists). Pl.'s Ex. 10, WL Records. Based on this comparison, counsel concluded that the subscribers' names did not match the names on the Lead List. Pl.'s Ex. 11, Chart Summarizing Mismatch.

Plaintiff also contends that the URL and IP addresses on the Lead Lists are fictitious for several reasons. First, Plaintiff is absolutely certain that neither he nor his wife sought information from Adsource, entered his contact information on Adsource's website, or consented to receive text messages about a cruise, even though

this is what the Lead Lists suggest. Gordon Dep. at 190:6–8. Second, the IP address listed for Plaintiff's phone number actually belongs to a La Quinta Inn near Ocala, Florida, a place where Plaintiff claims he has neither visited nor lived. Pl.'s Ex. 9, Gordon Aff. ¶¶ 7–9.

Beyond the Lead List, Plaintiff also asserts that Adsource's recordkeeping is generally unreliable. For example, according to Plaintiff, Brian Jackson, the plaintiff in the *Jackson* case,[2] alleged that he had received a text message during the same marketing campaign, but his name does not appear on the Lead List. *See* Pl.'s Ex. 12, Opt-in Record; 2d Am. Compl. ¶ 10, *Jackson v. Caribbean Cruise Line, Inc.*, No. 2:14-cv-2485 (E.D.N.Y.), ECF No. 55. According to other Adsource records, a person associated with Jackson's number was recorded as having consented to receiving text messages. *See* Pl.'s Ex. 12, Opt-in Record. But the recorded name of the person does not match his. *See id.*

Finally, for the purpose of establishing the scope and breadth of CCL's marketing program, Plaintiff points to a spreadsheet that CCL purports to be a list of 193,000 incoming calls received by CCL representatives from February 1, 2014, to April 1, 2015 ("Call-Back List"). Pl.'s Ex. 15, CCL Call-Back List, ECF No. 86-16. The list includes the date and time of the call, the phone number, the duration of the call in seconds, and the disposition of the call. *See id.* Some of the notations indicate that a sale had been completed or, oddly, that an answering machine had called CCL.

---

[2]    Because Jackson dismissed his TCPA claims with prejudice in that case, he is not a member of the proposed class here.

*See id.* The majority of notations indicate that the person either hung up on the CCL representative or that the phone call had been transferred to CCL from Adsource. *See id.* The Call-Back List does not identify names and does not indicate whether the person called in response to the toll-free number displayed on Adsource's website or after receiving a voicemail message or text message. *See id.*

Plaintiff contends that text messages sent to the persons on Adsource's Lead Lists and CCL's Call-Back List violated the TCPA. And so, Plaintiff has moved for class certification of his TCPA claim pursuant to Rule 23(b)(3), seeking to certify a class defined as follows:

> All individuals in the United States that: (1) had a text message sent to their cellular telephone number by, on behalf of, or for the benefit of CCL; (2) using an automated telephone dialing system; (3) between February 1, 2014 and April 1, 2015 (the "Class Period"); (4) whose cellular number appears in CCL's records (the "Class").

Pl.'s Mot. at 2, ECF No. 124.

With the proposed class definition in mind, the Court now turns to the merits of Plaintiff's motion for class certification.

## II. Legal Standard

Class certification is governed by Rule 23. As an initial matter, ascertainability of the class is an implicit prerequisite for class certification under Rule 23. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). A class is ascertainable if it is "defined clearly and based on objective criteria." *Id.* In particular, "class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.* at

660. But, at the class certification stage, ascertainability does not require that there is a "reliable and administratively feasible" way to identify the members of the putative class. *Id.* at 657–58. The Seventh Circuit has explicitly rejected the practice of other courts to move "beyond examining the adequacy of the class definition itself to examine the potential difficulty of identifying particular members of the class and evaluating the validity of claims they might eventually submit." *Id.* at 659.

In addition, under Rule 23(a), class certification is permitted only when: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see also Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 811 (7th Cir. 2012). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350–51 (2011) (internal quotation marks omitted).

Furthermore, proponents seeking class certification under Rule 23(b)(3) must show: "(1) that the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) that a class action is superior to other available methods of resolving the controversy." *Messner*, 669 F.3d at 811 (citing *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010)).

It is important to note that Rule 23 "does not set forth a mere pleading standard." *Wal–Mart*, 564 U.S. at 350. Rather, "[p]laintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements." *Messner*, 669 F.3d at 811. As such, when reviewing a motion for class certification, a court "may not simply assume the truth of the matters as asserted by the plaintiff," but instead must receive evidence and resolve factual disputes as necessary to decide whether certification is appropriate. *Id.* (citing *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)).

Although "the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits," *Messner*, 669 F.3d at 811, considerations bearing on class certification often overlap with issues underlying the merits of the plaintiffs' claims. *See Wal–Mart*, 564 U.S. at 351; *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 599 (7th Cir. 1993). A court must accordingly "make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (citing *Szabo*, 249 F.3d at 676).

### III. Analysis

Plaintiff has moved for class certification of his TCPA claim pursuant to Rule 23(a) and 23(b)(3), arguing that the proposed class meets the requirements of numerosity, commonality, typicality, and adequacy, as well as the requirements of predominance and superiority under Rule 23(b)(3). In response, CCL argues that the

class as defined is not reasonably ascertainable; that Plaintiff cannot establish numerosity, typicality, commonality, or adequacy; that individual issues predominate; and that class litigation is not a superior method of resolving the controversy.

## A.    Ascertainability

CCL raises three arguments to challenge the ascertainability of Plaintiff's proposed class. First, CCL suggests that the class definition is improper because it includes all people who received text messages via an automated telephone dialing system, rather than only those who received such text messages without prior express consent. *See* Def.'s Resp. Opp'n Pl.'s Mot. Class Certification ("Def.'s Resp.") at 11–12, ECF No. 105. But this is not fatal to the class. Although a putative class member must have received a text message without prior express consent in order to recover under the TCPA, see 47 U.S.C. § 227(b)(1)(A)(iii), "there is no requirement in Rule 23 that Plaintiff's class must be defined in terms of the statute allegedly violated." *Sadowski v. Med1 Online, LLC*, No. 07 C 2973, 2008 WL 2224892, at *2 (N.D. Ill. May 27, 2008).

What is more, including the limitation "without prior express consent" would create an impermissible fail-safe class. A fail-safe class is one defined "so that whether a person qualifies as a member depends on whether the person has a valid claim. Such a class definition is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Messner*, 669 F.3d at 825. Defining the class to include persons who received a text

message without providing prior express consent means that only those putative class members with meritorious claims would be members of the class. *See, e.g., Am.'s Health & Res. Ctr., Ltd. v. Promologics, Inc.*, No. 16 C 9281, 2018 WL 3474444, at *4 (N.D. Ill. July 19, 2018) ("If the instant class were defined by a legal parameter such as consent of the recipient class member, the result would be an impermissible 'fail-safe' class . . . . "); *G.M. Sign Inc. v. Stealth Sec. Sys., Inc.*, No. 14 C 09249, 2017 WL 3581160, at *3 (N.D. Ill. Aug. 18, 2017) ("[The] class definition does constitute a fail-safe class . . . only those to whom Stealth sent faxes without consent—that is, only those to whom Stealth would be liable—would be members of the class."); *Mauer v. Am. Intercont'l Univ., Inc.*, No. 16 C 1473, 2016 WL 4698665, at *3 (N.D. Ill. Sept. 8, 2016) (holding that TCPA class definition requiring lack of express consent was an improper fail-safe class).

Second, CCL contends that the class time period—February 1, 2014 to April 1, 2015—is overbroad because CCL ceased all marketing operations on December 28, 2014. Def.'s Resp. at 11–12. But CCL's Call-Back List shows that its representatives received hundreds of calls during the week leading up to and including April 1, 2015. *See, e.g.*, Pl.'s Ex. 15, Call-Back List. Therefore, the Court finds that the record sufficiently supports the proposed time period.

Third, CCL argues that the class definition is not premised on objective criteria. Specifically, as CCL sees it, Plaintiff cannot articulate any means of determining: (1) if Adsource sent the text messages; (2) to whom the text messages were sent; (3) the identity of the cell phone subscribers; (4) whether the persons

consented to receive the text messages; (5) if the persons received the text messages and, if so, how many each received; (6) if the persons suffered concrete injury; and (7) if the text messages were sent on behalf of CCL.  Def.'s Resp. at 12.

But such an extensive, merits-based inquiry is not necessary to determine whether an individual falls within the scope of the class, which is limited to those persons (1) who received text messages sent on CCL's behalf between certain specified dates, and (2) whose numbers appear on the Lead Lists or the Call-Back List.  These are straightforward criteria that can be readily applied.  As the Seventh Circuit stated in *Mullins*, the ascertainability inquiry goes to "the adequacy of the class definition itself," not to "whether, given an adequate class definition, it would be difficult to identify particular members of the class." 795 F.3d at 659.  Because the Court finds the class definition is based on objective criteria, Plaintiff has established that the class is ascertainable.

## B.     Rule 23(a)(1): Numerosity

Turning to the explicit requirements of Rule 23, subsection (a) requires that members of a certified class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity is satisfied where "it's reasonable to believe [the class is] large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co. v. Wagner Equities, Inc.*, 747 F.3d 489, 492 (7th Cir. 2014).  Generally speaking, classes of forty or more members are sufficiently numerous to warrant certification. *See, e.g.,*

*Pruitt v. City of Chi.*, 472 F.3d 925, 926–27 (7th Cir. 2007); *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 495 (N.D. Ill. 2008).

According to CCL, the proposition that anyone other than Plaintiff received the text messages at issue is sheer speculation. Plaintiff, however, points to the plaintiffs in *Izsak* and *Guiley*, whose numbers appear on the Second Lead List and who received unsolicited CCL text messages. *See Izsak*, No. 14-cv-62231-BB (S.D. Fla.); *Guiley*, No. 2014-CVI-1034 (Canton Ohio Mun. Ct.). Moreover, on November 5, 2014, Poole stated in an email to Langille that CCL was being inundated with complaints from people who had received unsolicited text messages. Pl.'s Ex. 2, Email of 11/5/2014 from J. Poole to B. Langille, CCL022064(JAX) (stating that CCL representatives are saying "*all their [A]dsource callers*" are complaining about unsolicited text messages and that they are "spending the whole day calming down irate consumers"). Indeed, of the 643 calls transferred to CCL from Adsource on November 5 alone, at least ten percent were complaints from text message recipients. *See* Pl.'s Ex. 15, Call-Back List. This is sufficient to show that at least 40 people received an unsolicited text message. *See G.M. Sign*, 2017 WL 3581160 at *2 (holding that numerosity was satisfied based on list of incoming complaints requesting not to be contacted). Plaintiff has satisfied the numerosity requirement.

## C.    Rule 23(a)(2): Commonality

For class certification to be proper, the asserted claims also must present common questions of law or fact. Fed. R. Civ. P. 23(a)(2). A question is common to the class if it generates a common answer, such that determination of the question

will "resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The common questions "need not address every aspect of the plaintiffs' claims," but they "must 'drive the resolution of the litigation.'" *Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 553 (7th Cir. 2016) (quoting *Dukes*, 564 U.S. at 350). For purposes of Rule 23(a)(2), "[e]ven a single [common] question" will suffice. *Dukes*, 564 U.S. at 359.

Here, the claims of all class members hinge on the resolution of at least one common question: whether Adsource used an automatic telephone dialing system ("ATDS") to send text messages on CCL's behalf. The resolution of this question will resolve an issue central to the validity of each of the claims. *See* 47 U.S.C. § 227(b)(1)(A)(ii) (prohibiting the use of any ATDS to make any call to a cellular telephone under certain conditions); *see, e.g.*, *Lanteri v. Credit Protection Ass'n L.P.*, No. 1:13-CV-1501-WTL-MJD, 2018 WL 4625657, at *3 (S.D. Ind. Sept. 26, 2018) (finding the issue of whether an ATDS was used to send text messages satisfied the commonality requirement). Furthermore, Plaintiff has presented evidence that this question can be answered on a class-wide basis. Poole admits that, as part of CCL's marketing campaign, Adsource used Twilio or a similar communication platform that utilized a computer program to send text messages. Pl.'s Ex. 1, Poole Dep. at 42:3–15, ECF No. 86-2; Poole Decl. ¶ 10. Accordingly, Plaintiff has satisfied the commonality requirement.

**D.    Rule 23(a)(3) Typicality**

Typicality under Rule 23(a) requires that the named plaintiffs' claims "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members" and "are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). The typicality requirement is thus satisfied when "the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chi. Police Ass'n*, 7 F.3d at 597.

CCL first argues that Plaintiff is not typical of the class for the same reasons it contends he cannot establish commonality or numerosity. Def.'s Resp. at 20. Because the Court has already dispatched those arguments, it need not rehash them here.

In addition, CCL argues that defenses unique to Plaintiff render him atypical of the class, citing cases from the Ninth Circuit and Central District of California. *See id.* at 21 (citing *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *Ngheim v. Dicks Sporting Goods, Inc.*, 318 F.R.D. 375, 381–83 (C.D. Cal. 2016)). But under established Seventh Circuit authority, "[t]ypicality under Rule 23(a)(3) should be determined with reference to the [defendant's] actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996); *see also CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724–25 (7th Cir. 2011) (quoting *Wagner*, 95 F.3d at 534). Because CCL's purported conduct with respect to the class—its decision

to allow Adsource to send unsolicited text messages on its behalf—is identical throughout the class, the typicality requirement is satisfied.

## E.    Rule 23(a)(4) Adequacy

The adequacy requirement under Rule 23(a)(4) comprises two parts: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chi. Police Ass'n*, 7 F.3d at 598. "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

"[A] majority of courts . . . have refused to permit class attorneys, their relatives, or business associates from acting as the class representative." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 90 (7th Cir. 1977).

> The most frequently cited policy justification for this line of cases arises from the possible conflict of interest resulting from the relationship of the putative class representative and the putative class attorney. Since possible recovery of the class representative is far exceeded by potential attorneys' fees, courts fear that a class representative who is closely associated with the class attorney would allow settlement on terms less favorable to the interests of absent class members.

*Id.* at 91 (citations omitted). Whether a close relationship renders a class representative inadequate is a fact-intensive inquiry to be determined on a case-by-case basis. *Id.* at 90.

CCL first argues that Plaintiff is not an adequate representative because he is a TCPA class-action attorney. But Plaintiff states that he has never prosecuted a

TCPA claim as an attorney. *Compare* Def.'s Resp. at 21, *with* Pl.'s Reply at 13. Moreover, Plaintiff argues that he represents the class solely in his role as a consumer who received an unsolicited text message. *See* Pl.'s Reply at 13. The Court holds that Plaintiff's occupation as a class-action attorney, in and of itself, does not call into question his adequacy as a class representative.

CCL also contends that Plaintiff's close ties with class counsel render him an inadequate representative. This argument merits greater scrutiny. "Strict oversight is necessitated since due process requires that absent class members be adequately represented in order to be bound by a court's judgment." *Susman*, 561 F.2d at 90; *see Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). "Class representatives need to be capable of saying no if they believe counsel are failing to act in the best interests of the class." *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 714 (7th Cir. 2015). An actual conflict of interest is not necessary. *Id.* at 715. Rather, it is sufficient to show that "the mere possibility of a conflict of interest . . . support[s] a finding that a fiduciary will not adequately represent the interest of others." *Id.*

In *Susman*, the class representative was an attorney, who had collaborated, as well as rented and shared an office suite, with an attorney who represented the class. The district court rejected the class representative due to the specter of a conflict of interest, and the Seventh Circuit affirmed. *Id.* at 88. Likewise, in *London v. Wal-Mart Stores, Inc.*, the Eleventh Circuit held that a long-standing friendship and former business relationship between the proposed class representative and class counsel created "a *present* conflict of interest—an incentive for [the class

representative] to place the interests of [class counsel] above those of the class." 340 F.3d 1246, 1255 (11th Cir. 2003) (emphasis in original). In so doing, the court cited with approval the Seventh Circuit's holding in *In re Sw. Airlines Voucher Litig.*, 799 F.3d at 715.

Here, Plaintiff and putative class counsel, Katrina Carroll of Lite DePalma Greenberg LLC ("LDG"), have jointly represented class action plaintiffs in five different matters, three of which are still pending.[3] Furthermore, they also share an office suite, receptionist, and fax machine. Pl.'s Disclosure Stmt. ¶ 5, ECF No. 71; Def.'s Ex. 1, Pl.'s Dep. at 18:2–21, 24:6–10, 55:20–24, ECF No. 105-1; *see Susman*, 561 F.2d at 93. In addition, LDG's office space is owned by a partnership involving Plaintiff's cousin, to which LDG pays rent. Def.'s Ex. 1, Pl.'s Dep. at 22:12–16, 55:9–15. And Plaintiff has even sought employment with LDG. *Id.* at 19:20–20:5. What is more, Plaintiff lives close to Carroll, their families socialize together, and their daughters attend the same school. *Id.* at 52:13–16, 53:11–21. Furthermore, Plaintiff serves as co-class counsel with Kyle Shamberg, yet another attorney from LDG, in cases currently pending before the Court, and on one occasion, Shamberg referred a case to Plaintiff's law firm for which he was paid a referral fee. Pl.'s Reply Br. at 16 n.13, ECF No. 114.

Based upon this record, the Court finds that Plaintiff's significant business ties to Carroll, Shamberg, and LDG, as well as his close personal ties to Carroll, cast

---

[3]     Plaintiff was also a class representative, with LDG acting as putative class counsel, in *Gordon v. American Resorts International Ltd.*, No. 14 C 6944 (N.D. Ill.), but that case settled without a substantive determination as to class certification.

significant doubt upon his ability to put the interests of absent class members above that of class counsel. Accordingly, the Court finds that Plaintiff has failed to satisfy Rule 23(a)(4)'s adequacy requirement.

## F. Rule 23(b)(3): Predominance

Rule 23(b)(3) also poses a barrier to class certification here. The rule requires that common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997) (stating that "the predominance criterion is far more demanding" than "Rule 23(a)'s commonality requirement"). To establish predominance, a plaintiff must be able to prove his case with "evidence that is common to the class rather than individual to its members." *Messner*, 669 F.3d at 811 (internal quotation marks omitted). If a determination of whether plaintiffs suffered harm based on the defendant's conduct requires resolving individualized questions of fact, predominance is not satisfied. *Siegel*, 612 F.3d at 936.

An "inquiry into the predomination analysis must take two steps." *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981). First, the court focuses "on the substantive elements of plaintiffs' cause of action and inquire[s] into the proof necessary for the various elements." *Id.*; see *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The court's analysis under the first step also considers the proof necessary to adjudicate defenses to the claim. *Channell v. Citicorp Nat'l Servs. Inc.*, 89 F.3d 379, 386 (7th Cir. 1996). "Second, after examining the proof necessary [the court] must inquire into the form that trial on these issues would take." *Simer*, 661

F.2d at 672. During the latter step, "it also becomes necessary to examine the procedural devices and alternatives available in trying class actions." *Id.*

First, as to Plaintiff's claim, to establish a TCPA violation, Plaintiff must prove that Adsource sent on CCL's behalf text messages to class members using an ATDS. *See* 47 U.S.C. § 227(b)(1)(A). Plaintiff's proof that Adsource used an ATDS to send text messages on behalf of CCL is evidence common to the class. *See, e.g.,* Pl.'s Ex. 1, Poole Dep. at 42:3–15, ECF No. 86-2; Poole Decl. ¶ 10 (stating that Adsource used communication platforms employing a computer program to send text messages).

For its part, CCL argues that Plaintiff has failed to adduce class-wide evidence establishing the identity of those who actually received text messages. In support, CCL notes that (1) the Lead Lists do not indicate whether the enumerated individuals actually received any text messages, and (2) the Call-Back List simply records *incoming* calls without any information as to whether a call was received in response to a text message or some other advertisement. *See* Call-Back List; Poole Decl. ¶ 9c. But "arguments about whether someone belongs in the class[] do not speak to whether common questions predominate among class members." *Birchmeier*, 302 F.R.D. at 254. So this objection is not well-taken.

Turning to CCL's potential defenses, to prevail on a consent defense, CCL will be required to show that Adsource had obtained prior express consent from an individual class member before sending a CCL text message to him or her. *See* 47 U.S.C. § 227(b)(1)(A); *Blow v. Bijora, Inc.*, 855 F.3d 793, 803 (7th Cir. 2017) ("Express consent is an affirmative defense on which the defendant bears the burden of proof.").

In TCPA cases, "[c]ourts determine whether issues of individualized consent defeat . . . predominance . . . on a case-by-case basis after evaluating the specific evidence available to prove consent." *Physicians Healthsource, Inc., v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 725 (N.D. Ill. 2016). "[W]hen the defendant provides specific evidence showing that a significant percentage of the putative class consented to receiving calls, issues of individualized consent predominate." *Legg v. PTZ Ins. Agency, Ltd.*, 321 F.R.D. 572, 577 (N.D. Ill. 2017). If, however, the defendant "fail[s] to set forth this specific evidence and instead only make[s] vague assertions about consent, then individualized issues regarding consent will not predominate over common questions of law or fact so as to prevent class certification." *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 107 (N.D. Ill. 2013).

Here, CCL provides specific evidence in the form of Langille's declaration, attesting that Adsource sent text messages only to those who entered their names and phone numbers on Adsource's landing page and checked the box indicating their consent to receive text messages via an auto-dialer. Def.'s Ex. 5, Langille Decl. ¶¶ 8, 10, 11; *see also id.*, Ex. A, Adsource Landing Page, ECF No. 105-5. CCL also points to Adsource's Lead List and Second Lead List that together identify over 300,000 individuals, as evidence of class members who provided consent to receive text messages, along with their names, phone numbers, and IP addresses.

In response, Plaintiff identifies certain individuals, who appear to contradict CCL's characterization of this evidence. For instance, Plaintiff himself testified that his cell phone number appears on the Lead List, even though he had not provided

prior express consent. Gordon Dep. at 123:18–24, 154:5–155:9, 190:6–8; Lead List, Lead 744436. Plaintiff also points to two other individuals, whose phone numbers appear on the Second Lead List, but attest that they also had not provided consent to receive the text messages. *See* Pl.'s Reply, Ex. F, *Izsak* Compl. ¶ 31; id., Ex. C, *Guiley* Compl. ¶ 15. Furthermore, Plaintiff provides evidence that at least fifty individuals named in the Lead List in 2014 and 2015 were not associated with their corresponding phone numbers as of 2017. Pl.'s Ex. 10, WL Records; Pl.'s Ex. 11, Chart Summarizing Mismatch.[4] But Plaintiff's efforts to attack the probative value of the Lead Lists with data from individual putative class members only proves CCL's point. Given the Lead Lists and Langille's declaration, individualized factual inquiries will be necessary to determine whether the individuals on the Lead Lists did, in fact, consent, and those issues will predominate the litigation.[5] And Plaintiff has not presented a viable approach based on common proof to establish the lack of consent with respect to the class. Accordingly, a multitude of mini-trials will be unavoidable.

---

[4] Many of the 2017 public records show that persons with the Lead List phone number were first reported as having the numbers after February 2015, which creates a reasonable inference that they were not associated with the phone number on the date recorded on the Lead List. *Compare* Pl.'s Ex. 7, Lead List (showing 171,000 calls to Adsource between May 29, 2014, and February 9, 2015), *with* Pl.'s Ex. 10, WL Records.

[5] In the alternative, Plaintiff argues that, even if a person had consented to receive CCL text messages, the consent language itself is deficient as a matter of law, because it does not specifically reference consent to receive advertisements or telemarketing messages. *See* Pl.'s Mem. Supp. Mot. Class Certification, at 22–23. The Court disagrees. The consent language states: "I consent to be called and/or texted by or on behalf of Caribbean Cruise Line via autodialer or prerecorded voice at the number above . . . . My consent does not require purchase. Standard cellular rates will apply." Pl.'s Ex. 6, Pl.'s Dep. Ex. 4. Because consent to receive calls and texts "via autodialer or prerecorded voice" unmistakably references consent to receive advertisements or telemarketing messages, this language is not deficient as a matter of law.

*See, e.g., Espejo v. Santander Consumer USA, Inc.,* No. 11 C 8987, 2016 WL 6037625, at *10 (N.D. Ill. Oct. 14, 2016) (finding predominance was not satisfied where individualized mini-trials regarding consent were required); *G.M. Sign*, 2017 WL 3581160, at *8–9 (same). For these reasons, the Court finds that Plaintiff has not satisfied Rule 23(b)(3)'s predominance requirement.

## F. Rule 23(b)(3): Superiority

Rule 23(b)(3) permits class certification only in cases where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Commonly referred to as 'manageability,' this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). To evaluate superiority, a court weighs: (1) "the interest of members of the class in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the difficulties likely to be encountered in the management of a class action." *Id.* n.3; *see* Fed. R. Civ. P. 23(b)(3). The Seventh Circuit has recognized that Rule 23(b)(3)'s superiority requirement is closely related to the requirement of predominance—the more that common questions predominate over other issues in the case, the more likely it is that a class action is the superior method of adjudication. *See Messner*, 669 F.3d at 814 n.5.

Here, because TCPA claims involve small recoveries, class members would have little interest in individually controlling actions in separate venues, as indicated by the fact that only a handful of other plaintiffs have filed similar actions against CCL and each of those plaintiffs has brought a class action.[6]  That said, due to individualized factual inquiries required to adjudicate class members' claims, there is a high likelihood that maintaining the litigation as a class action would be unmanageable.  The Court has considered alternative procedural devices available in trying class actions, such as questionnaires and affidavits, but none are up to the task of providing CCL a meaningful opportunity to test the veracity of each putative class member as to the issue of consent.  As such, the Court finds that the manageability problems of litigating the claims as a class action outweigh the benefits, and allowing this case to proceed as a class action would not efficiently or fairly adjudicate the controversy.

---

[6]  Four others filed their own class action lawsuits.  *See Iosello v. Caribbean Cruise Line, Inc.*, No. 14 C 6118 (N.D. Ill.) (settled on Feb. 22, 2017); *Jackson v. Caribbean Cruise Line, Inc.*, No. 14-cv-02485-ADS-AKT (E.D.N.Y.) (dismissed with prejudice on July 27, 2016); *Izsak v. Caribbean Cruise Line, Inc.*, No. 14-cv-62231-BB (S.D. Fla.) (stayed on Dec. 3, 2014); *Guiley v. Caribbean Cruise Line Inc.*, No. 2014-CVI-1034 (Canton Ohio Mun. Ct.) (settled on Mar. 24, 2014).

## IV. Conclusion

For the reasons stated herein, Plaintiff's Rule 23 motion for class certification

[94] is denied.

**IT IS SO ORDERED.**                    **ENTERED   2/8/19**

_____

**John Z. Lee**
**United States District Judge**