# EXHIBIT 3

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    RICHARD GORDON, individually     )   Docket No. 14 C 5848
      and on behalf of all others      )
 4    similarly situated,              )
                                       )
 5                         Plaintiff,  )
                                       )
 6              v.                     )   Chicago, Illinois
                                       )   October 4, 2017
 7    CARIBBEAN CRUISE LINE, INC.,     )   2:00 o'clock p.m.
      a Florida Corporation,           )
 8                                     )
                           Defendant.  )
 9
                      TRANSCRIPT OF PROCEEDINGS - MOTION
10                     BEFORE THE HONORABLE JOHN Z. LEE

11    APPEARANCES:

12    For the Plaintiff:          LITE DePALMA GREENBERG, LLC, by
                                   MR. KYLE ALAN SHAMBERG
13                                 MR. ISMAEL TARIQ SALAM
                                   211 West Wacker Drive
14                                 Suite 500
                                   Chicago, Illinois 60606
15
      For the Defendant:          GREENSPOON MARDER, P.A., by
16                                 MR. JEFFREY BACKMAN
                                   200 East Broward Boulevard
17                                 Suite 1800
                                   Fort Lauderdale, Florida 33301
18
                                   TABET DiVITO ROTHSTEIN, by
19                                 MR. TIMOTHY A. HUDSON
                                   209 South LaSalle Street
20                                 7th Floor
                                   Chicago, Illinois 60604
21

22                    ALEXANDRA ROTH, CSR, RPR
                        Official Court Reporter
23                     219 South Dearborn Street
                              Room 1224
24                     Chicago, Illinois 60604
                           (312) 408-5038
25
```

1     (Proceedings had in open court:)

2          THE CLERK:  Case 14 C 5848, Gordon versus Caribbean

3     Cruise Line.

4          MR. SHAMBERG:  Good morning, your Honor.  Kyle

5     Shamberg for plaintiff and the putative class.

6          MR. BACKMAN:  Good morning, your Honor.  Tim Hudson

7     and Jeffrey Backman for the defendant, your Honor.  Excuse that

8     I am not wearing a jacket.  I couldn't get a jacket over my

9     cast on my hand.  So that's why.

10          THE COURT:  All right.  So we are here for argument

11     with regard to plaintiff's motion for class certification, as

12     well as plaintiff's motion, I guess a related motion, to strike

13     the declaration of Benjamin Langille.  I think that's how you

14     pronounce.  Is that how you pronounce his name?

15          MR. SHAMBERG:  I say Langille, but it's also a guess,

16     Judge.  He may know.

17          MR. BACKMAN:  Yes, it's the plaintiff's motion as

18     well.  But I believe you said defendant.

19          THE COURT:  Okay.  Great.

20          So I'll hear from the plaintiff first and then from

21     the defendant.  So you can take a seat.

22          But first question to the plaintiff is, there seems to

23     be much disagreement as to whether or not we can even identify

24     the class or who the class consists of in this case.  I know

25     you relied upon the two lists, the text list and the call-back

1    list.

2          So why don't you talk to me about those lists and what

3    they mean to this case and why you believe that there is an

4    identifiable -- I don't want to use the term ascertainable, but

5    at least an identifiable class here.

6          MR. SHAMBERG:  Yes.  I understand, Judge.  I also I

7    think agree with that distinction in terms of this question

8    about identification being more maybe a manageability concern

9    than ascertainability concern.  But so these lists.  There

10    is -- let's start with the two text lists, what we refer to as

11    the text lists, what defendant purports to be consent lists.

12          So what do we know about these lists?  We know that

13    they contain information regarding a phone number and a date.

14    And then there is additional name, IP address, website, and

15    then this DID number, which is the inward number at Adsource to

16    be called.

17          Now, when we look at the list itself, we see an entry

18    for a plaintiff Mr. Gordon.  His name is not associated with

19    it, but it's his cell phone number.

20          THE COURT:  Back up for a second.  Where did you get

21    these lists?  Where are the lists from?

22          MR. SHAMBERG:  The lists were produced in the Jackson

23    litigation by Benjamin Langille, by e-mail.

24          THE COURT:  Okay.

25          MR. SHAMBERG:  So the lists have some information in

1   there that is indisputably accurate.  The plaintiff's cellular

2   telephone number is in that list.  And the date associated with

3   his number is the same date that he received the text.

4           THE COURT:  And so can you refer me to -- I have the

5   Excel spreadsheet out.  And so can you refer me to a particular

6   line number?

7           MR. SHAMBERG:  My associate will pull that up, Judge.

8   I'm sorry.  I don't have it right in front of me.  But -- and

9   I'll get back to that in a second.  I continue to talk about

10  the list.

11          So that's information that we know is accurate.  Now,

12  the defendant contends that this is an opt-in list, people who

13  consented to receive the text messages.  But --

14          THE COURT:  And then they opted in according to

15  defendants by clicking on banner ad that goes to a landing page

16  and that they input the name and the phone number along with

17  clicking on next to language with regard to consent.  And then

18  they send that off.

19          MR. SHAMBERG:  Yes.

20          THE COURT:  And that's how this list was created, at

21  least according to defendants.

22          MR. SHAMBERG:  According to them, yes.  According to

23  defendant, the way it would work is the steps that your Honor

24  just described.  Then they would be taken to another page that

25  would provide a number for Adsource for them to call.  They

1    would call the number to find out about the deal.

2          If they didn't call, then they would receive a text

3    message encouraging them to call the number, or reminding them

4    something like, you know, just following up on your free cruise

5    offer.  Here is a reminder.  Don't forget about your offer,

6    those kind of things.

7          But then when you actually dig down -- do you have

8    the --

9          MR. SALAM:  Your Honor, Ismael Salam on behalf of

10   plaintiff and the class.

11         If you sort by lead number, which is column A in the

12   first text list, it's lead No. 744436, with the date of July

13   28, 2014.

14      (Brief pause.)

15         THE COURT:  Okay.

16         MR. SHAMBERG:  At that entry, Judge, you can see the

17   date July 28.  That's the data Mr. Gordon received the

18   offending text message.  And the number just to the left of the

19   website there, the 773 number, is in fact his cellular

20   telephone number.

21         Now, in addition, in column C there, Judge, you can

22   see there is a number 1-813, and it continues.  That's the DID

23   number.  That's in other words the number at Adsource that

24   somebody would be calling to speak to a representative.  That

25   number associated with this entry is the same number that

1    appeared in the text message that the plaintiff received.

2            So there is information here.  You know, one of the

3    issues that the defendant raised is, well, we say the list is

4    unreliable.  So how can we rely on it for anything in support

5    of class certification?

6            The point is, there is information in here that

7    clearly is reliable:  The date, the DID number, and the number

8    of the cellular telephone that received the text message.

9            What's unreliable is the information that purportedly

10   goes to consent to the opt-in.  You know, here for this entry,

11   apparently according to the list someone named Stephanie Byrd

12   opted plaintiff's cellular telephone number in from a La Quinta

13   Inn in Ocala, Florida.  Plaintiff has never been to Ocala,

14   Florida.  The plaintiff didn't do it.  He doesn't know anyone

15   named Stephanie Byrd.

16           And then when we looked at other numbers on this list,

17   50 other numbers on this list, they were randomly sampled, it

18   was the exact same thing.  The names did not match this -- the

19   public records that show who this subscriber for that phone

20   number was.

21           So you have a list here that does seem to track when

22   text messages are sent.  It certainly was in the case of our

23   client.  But it doesn't provide any useful information with

24   respect to consent.  In fact, the consent part of it seems to

25   be entirely wrong or, you know, worst case scenario made up.

1        So --

2        THE COURT:  Has there been any discovery with regard

3    to this list and what it means and -- I take it that was there

4    any discovery done in the Jackson case or in this case with

5    regard to the source of the lists and the names in the lists?

6        MR. SHAMBERG:  Well, there was some discovery done --

7    in the Jackson case the answer is no.  Here we did do some.

8    We -- we tried to corroborate this.  We served subpoenas on

9    third party entities, including Twilio, who is the entity that

10    was sending the texts.

11        We did get some records of Mr. Langille having sent

12    text messages, maybe 4,000 or so.  But it was -- it was not

13    overlapping with the entries in this list.  And I think the

14    difficulty there may have been, when Twilio was searching its

15    records, it was doing so based on Mr. Langille's name and his

16    company Adsource.  If he had a separate account set up with any

17    kind of different name that wasn't associated with that,

18    those -- you know, we wouldn't have gotten that information

19    because we didn't have the right input to give Twilio.

20        So there aren't other records aside from the

21    investigation that plaintiff's counsel did looking at the

22    public records speaking to these subscribers.  But I think the

23    issue is, for class certification we're talking about consent

24    and really predominance.  I think that's one of the big issues

25    here, consent, does it predominate.

1      We don't have any valid evidence of consent in this

2  case, Judge.  Mr. Gordon's information is not --

3      THE COURT:  Let's take a step back --

4      MR. SHAMBERG:  Sure.

5      THE COURT:  -- Mr. Shamberg.  What evidence do you

6  have that the texts -- aside from the one that your client got

7  on that day, that the texts were actually sent to all of the

8  phone numbers that appear on the text list?

9      MR. SHAMBERG:  Well, so in addition to the

10 circumstantial evidence of Mr. Gordon having received one, we

11 know that -- I was kind of describing how this campaign was set

12 up.  So even according to -- let's say that everything was

13 going exactly the way that the campaign was described by

14 defendants, and they were doing everything the way it was

15 intended to be done.  If people opted in, they would then

16 receive a text message if they didn't follow up.

17     So these are at worst, let's say from my position, at

18 worst people who either received text messages or were going to

19 receive text messages as a part of the campaign.  And so what I

20 would say is, I think a jury can look at this and conclude on a

21 classwide basis, based on some of the evidence that I've

22 described, that, okay, this actually isn't a consent list.

23 This is a list of people that they were sending or intended to

24 send text messages to.

25     Now, if there is -- if your Honor is concerned that

1   perhaps there are some people on this list who were not sent

2   text messages, I think the Birchmeier case can be helpful there

3   because in addition to having these defendants' records that we

4   can rely on, we can also have class members aver that they did

5   in fact receive this text message.  And then if there are

6   certain members who appear on this list but cannot aver that

7   they actually received the text message at issue, they, you

8   know, would, therefore -- their proof of class membership would

9   be insufficient.

10           In fact, you know, the Birchmeier case in a recent

11   ruling from Judge Tharp in the GM Sign case said, even in a

12   TCPA context you can have self-identification.  But here we're

13   not simply relying on self-identification.  That could be used

14   in conjunction with this list to ferret out anyone who may have

15   not actually received a text on this list.

16           And in addition, you know, we have almost 200,000

17   different --

18           THE COURT:  So let me make sure I understand.

19           MR. SHAMBERG:  Sure.

20           THE COURT:  Is your position that I don't have to find

21   that texts were actually sent out to all of these numbers for

22   the purpose of class certification?  That that's a decision

23   that can be somehow deferred later on, either at the liability

24   stage or at a damages stage?

25           MR. SHAMBERG:  Well --

1    THE COURT:  Don't I have to -- in order to -- in order
2    to -- the class that you're requesting that I certify, right?
3    MR. SHAMBERG:  Yes.
4    THE COURT:  Let me pull it up here.
5    MR. SHAMBERG:  It appears on page 2 of our motion,
6    Judge.
7    THE COURT:  It states:  All individuals in the United
8    States that, one, had a text message sent to their cellular
9    phone -- telephone number by, on behalf of, or for the benefit
10   of CCL, right?
11   MR. SHAMBERG:  Yes.
12   THE COURT:  And then there is other qualifications
13   there.
14   So one of the first things that I have to determine
15   is, I have to determine whether -- when I think about a class
16   is, one of the requirements is that text message actually was
17   sent to their cellular telephone number.
18   MR. SHAMBERG:  Yes.
19   THE COURT:  And so I'm trying to figure out how I go
20   about making that determination.  Now, you provided me with
21   this list.  But as you say, the list is -- could possibly,
22   perhaps even equally, constitute lists that were created by
23   people consenting or in some way that was formulated by the
24   defendant for the -- so that they could send text messages to
25   these people.  But that's not what your class definition

1    requires, right?  It says that a text message actually was sent

2    to the cellular telephone number.

3         And so I guess my initial question is:  How do I make

4    the determination, on what are you relying to establish, that

5    the people whose phone numbers appear on the text list actually

6    had text messages sent to them, other than the testimony of the

7    named plaintiff, Mr. Gordon, that says, you know what?  My

8    number appears on there, and I received a text.

9         MR. SHAMBERG:  Well, in addition to that, it may rely

10   on class members' averring to having received that text.  And I

11   would -- so let's look at the Mullins case, right?  That was a

12   case where there were no records and the, you know,

13   identification of a class member was based on them remembering

14   that they purchased a bottle of glucosamine potentially four

15   years before and stating that fact.

16        So the Court in conjunction with the list can employ a

17   very similar tactic.  I mean, it's really the same thing that

18   was done in Mullins.  It's class members saying, yes, I did in

19   fact receive this text.  And, you know, the -- we can develop

20   the form for how they would do that, what would make the most

21   sense.

22        It's the same situation in Mullins.  But it can be

23   narrowed here because, you know, theoretically, we can do

24   that --

25        THE COURT:  But isn't that -- in Mullins, though, the

1    product was actually sold.  So we know that there are buyers

2    out there, right?  In this case, how do we know other than Mr.

3    Gordon that there were people out there that received a text

4    from the defendant --

5              MR. SHAMBERG:  Yes.

6              THE COURT:  -- on the list?

7              MR. SHAMBERG:  Yes, I can -- I can certainly touch on

8    that, Judge.  And I want to just generally -- for your own

9    reference later, I would direct you to page -- pages 8 to 11 of

10   our initial motion, where we talk about the complaints that

11   were coming in to Adsource and CCL.

12             But throughout the entirety of this -- so this

13   campaign in our class period starts in February, February 1 of

14   2014.  In March of 2014, CCL was receiving complaints from

15   customers saying, I got a text message that I never signed up

16   for.  Why am I getting these?

17             It went on.  And I'm sorry.  I want to actually pull

18   out some of the language.

19             THE COURT:  And are you able to correlate those phone

20   calls with numbers that appear on the text list?  Or are those

21   general complaints?

22             MR. SHAMBERG:  Those are general complaints.  But, you

23   know, it speaks to -- I think part of the argument from the

24   defendant is that there is no evidence that anyone was ever

25   sent a text message other than the plaintiff.  That's clearly

1   not true. You know, Jennifer Poole, who was their 30(b)(6)

2   witness, testified that Adsource call center was blowing up

3   their phone with complaints. The call center is getting really

4   funked out because managers are spending the whole day to

5   calming down irate customers who said they never signed up for

6   text messages. They were getting inundated with complaints

7   about, I never signed up to receive anything, and I'm getting

8   these text messages.

9         So those complaints aren't linked directly to the

10   numbers on this list. But if we look at the list, we know that

11   text messages were being sent and the people were complaining

12   about them.

13         And if we take the list, if we send direct notice,

14   which we can do, to the people on that list, and then perhaps

15   that would be circumscribed by the additional requirement

16   needing the class member to aver that they did -- they did in

17   fact receive the text message, now you have -- you know, you

18   have evidence there that, yes, I received a text message

19   advertising this cruise. And that person's number actually did

20   appear in the list. So now it's corroborating the list. And

21   that's an ascertainable class member right there. And that's a

22   manageable way to do it, I think.

23         THE COURT: But I think that that methodology has the

24   potential problem of being both over-inclusive and under-

25   inclusive, right? So you don't know whether the complaints

1   that Adsource got based upon this campaign are in any way

2   affiliated with the telephones that appear on the text list.

3          So there might be people that receive texts who should

4   be part of this class who aren't on the list.  On the other

5   hand, there is -- other than Mr. Gordon's statement and those

6   general complaints, there is nothing to say that anyone else on

7   that text list actually got text messages, from the defendant.

8          And so I'm just trying to figure out how I go about

9   establishing that this class actually exists.  So let's talk

10  about, for example, numerosity, right?  How do I know how many

11  people are in this class if the texts lists have a potential to

12  be over-inclusive, since I can't say that everyone of the 200

13  and whatever thousand people, 282,000 people, that you've

14  identified received texts other than Mr. Gordon?

15         And I understand that you did a sampling of sorts of

16  the 50 numbers of this 200 -- from the spreadsheet.  But the --

17  while the investigation might reveal that the names on the

18  consent list are not current subscribers, I guess, No. 1, who's

19  to say that they weren't subscribers at the time?  And No. 2,

20  who's to say that they actually received texts as they need to

21  do in order to be part of this class?

22         And, you know, I'm kind of puzzled because generally

23  speaking, usually the -- in cases like this or in other

24  consumer type cases, we know that whatever action is complained

25  of took place, right, whether it's the sale of glucosamine or

1    the misrepresentations with regard to the sale.

2            Here, though, I'm struggling with the argument that

3    the plaintiff has presented enough facts to satisfy its burden

4    that the class that it defines actually exists.  Now, I don't

5    think we can wait until class members self-identify to

6    establish whether they exist or not, because we have that over-

7    inclusive, under-inclusive problem.

8            And so I guess I'm still trying to understand why it

9    is that you think that this list is going to be sufficient for

10   you, for plaintiffs, to establish the -- to satisfy their

11   burden that a class actually exists.  I do agree that

12   ascertainability is not an issue with regard to this class

13   definition, right?  I mean, if in fact these things --

14   plaintiff can establish these elements, the definition is -- I

15   think meets the Mullins test.

16           But the question in the first instance is, did this

17   really happen?  And to whom did it happen?  And if you are

18   relying upon the various complaints to Adsource regarding the

19   campaign at the time, you have nothing to tie those people to

20   this list, or no way to kind of identify who that might be.

21           MR. SHAMBERG:  Well, I -- just to address that piece,

22   Judge.  So, you know, when you look at the class definition,

23   the fourth part is, cellular -- whose cellular number appears

24   in CCL's records.  So that's not limited just to the list.

25           So when you have these people who are complaining,

1    you'll see e-mails between Adsource and CCL where they'll say,

2    I need the opt-in information.  This person was complaining.

3    Here is the cell phone number.  So now that's somebody that we

4    know, right?  We have the cell phone number.  And there is

5    somebody who actually called in and complained and said, I

6    didn't consent and I received this text message.

7              So those are also records in their possession that

8    could be used.  And that's going to be -- I'm sorry.  I don't

9    have the number.  But I would represent that I believe that

10   number in and of itself would be sufficient to meet the

11   numerosity standard, even if you set the lists aside.

12             And I just --

13             THE COURT:  So how do we go -- for example, how do we

14   go about sending notice if certification was granted?  Would

15   the claims administrator be given -- or the settlement

16   administrator be given this text list, and then they would have

17   to basically send out direct notice to everyone on the text

18   list, even though we don't know whether -- or we don't know how

19   many of those people actually to whom texts were sent?

20             And then we're just going to ask -- we're just going

21   to wait to hear from them to say whether, yes or no, I did

22   receive or didn't receive it?  So they get to determine the

23   scope of the class?

24             So I find it, it's just -- right?  It's puzzling to me

25   because -- because I am just trying to grasp at again how it is

1    that I am supposed to determine, No. 1, whether CCL engaged in

2    this text campaign during the time period of the class.  No. 2,

3    if it did how many people it impacted.

4         Now, you say that the record will show that there are

5    at least 20, 30 -- at least 20, 30, 40, people that it impacted

6    because those are the people that complained.  But that's far

7    less than the 282,000 phone numbers at the moment that

8    plaintiff contends should constitute the class.

9         And my -- I'm just trying -- am I missing something?

10   And so what am I not getting here?

11        MR. SHAMBERG:  Well, it seems like what -- what the

12   ideal evidentiary answer to this would be a transmission log,

13   right, from a carrier.  Here is all the texts being sent.  And

14   I -- that would be great.  But it's been ruled to be not

15   necessary.  That's the CE Design case here from the Northern

16   District of Illinois 2009.  So that's kind of the ideal

17   situation.  We have the transmission log.  You know all the

18   texts were sent, who they were sent to.

19        We don't have that here, but that's not what we need

20   for class certification.  I understand, you know, your Honor's

21   concern there.  Aside from the complaints themselves that I

22   think are little bit more straightforward, you know, the -- the

23   list is a method of, based on the other evidence in the case,

24   targeting who presumptively either received the text message or

25   would have.

1       You know, so this is a list of people who, according

2   to us, got the text message, or according to defendant had

3   signed up and would have been sent a text message.  So we're

4   trying to target it on people who either got the text or most

5   likely to have received it.  And again, you know, I know your

6   Honor said something about how do I know this campaign happened

7   and things?  I know it's not tied directly together with the

8   list and with the complaints.  But there is no doubt that the

9   record is replete with evidence of people saying, I was

10  receiving these texts.  I didn't sign up for them.  I mean, the

11  campaign was happening.

12      In terms of the list, it's really just a way of trying

13  to narrow it down.  I mean, theoretically I would argue that in

14  line with Seventh Circuit precedent, a class could be certified

15  here based simply on publication notice and self-

16  identification.  Now, I know that doesn't get to the heart of

17  the question that your Honor had, which is, okay, does that

18  class exist?  But it -- it could theoretically be done that

19  way.

20      The reason that we want to use the list in the

21  complaints is, it targets people who either did or most likely

22  to receive these text messages.  And just the -- the extent of

23  the feedback that Adsource and CCL were getting shows that, you

24  know, if we're looking at 40 as the number, that we're going to

25  meet the hurdle for numerosity, you know, even though we can't

1    say it's 223,000 who actually got the texts.

2          THE COURT:  So I agree with you to this extent:  I

3    agree that if there was evidence, say, testimony from a CCL

4    representative or Adsource representative that said, you know,

5    during the relevant time period, we did have this campaign

6    where we gathered information, telephone information, and we

7    sent out texts to these people.  Now, from CCL's standpoint, we

8    believe we had the consent to do that.  Plaintiff will

9    disagree.

10          But there is evidence that they actually engaged in

11   that practice and evidence that they did that on a wide enough

12   scale.  I agree with you that you may have a class without even

13   needing the phone numbers, right, or the transmission data,

14   because the phone numbers and transmission data to some extent

15   really help with notice, right?  But you might not need that

16   information in order to have a class definition that meets Rule

17   23.

18          But when I reviewed the briefs, I guess it wasn't

19   clear to me whether or not you had evidence like that other

20   than the complaints, which is evidence of some text message

21   campaign, and this text list.

22          So let me ask you, what sort of evidence is there in

23   the record that CCL through its third party vendor Adsource

24   engaged in this campaign during the relevant time period, other

25   than putting the list aside?

1    MR. SHAMBERG:  It was -- it was these complaints.  And

2    I think I just want to clarify.  When these complaints were

3    coming in, they were coming in to Adsource saying that we

4    received this text message about the free cruise.  I never

5    signed up for it.  Why am I getting it?  And then those

6    complaints were forwarded to CCL.

7         So, you know, they were coming in during the time

8    period that this campaign was ongoing.  We -- there is -- there

9    is -- there was no other free cruise campaign, at least there

10   is no evidence of it, that Adsource was conducting at the time

11   on CCL's behalf.  So those complaints necessarily related to

12   this campaign.

13        THE COURT:  And what is the testimony from CCL with

14   regard to the campaign itself?  When did this banner ad

15   campaign take place?

16        MR. SHAMBERG:  It was I think February, February.  And

17   then there is a dispute as to when it ended.  I think they say

18   that it ended in December of 2014.  We say February of -- or

19   April of -- April of 2015.  But there is no doubt that he was

20   part of this.

21        And actually, you know what?  It might have been a

22   little bit earlier than that.  I'm sorry, Judge, because Ben

23   Langille had a different entity called Vatara that he was

24   engaging in a similar campaign with CCL in early 2013.  CCL

25   terminated that campaign with him in July of 2013 based on

1   noncompliance with the text messages.

2          Then a month later, in August of 2013, they enacted

3   this new campaign.  So it's possible that the campaign started

4   as early as September, let's say, of 2013, and then continued

5   until we would say at least April of 2015.  They would probably

6   say December 2014.

7          THE COURT:  So is your theory of the case then that

8   CCL and Adsource purport to have this kind of banner ad

9   campaign where you click on a banner ad?  You go to a landing

10  page, fill in your information.  And that goes -- and then if

11  you don't call the number then you get a text.  That at the

12  time that they were -- had this campaign, that that campaign

13  was basically a ruse to obtain or obfuscate what they were

14  really doing, which is sending out texts without consent on an

15  unsolicited basis?  Or are you saying that they had this

16  Adsource campaign in conjunction with this other text campaign

17  where they're sending out texts to people without obtaining

18  consent?

19         MR. SHAMBERG:  The former.  And, you know, it's not my

20  theory of the case necessarily.  It's what the evidence shows.

21  I mean, there isn't any evidence that anyone consented to --

22  you know, the consent is, you sign in.  You opt in.  Then you

23  get the text message.  They don't have a single -- not one

24  document that shows anyone consented, not anyone.  All the

25  information regarding consent on the text list is inaccurate.

1    And, of course, it's their burden to show consent.

2              THE COURT:  So is it your position that they obtained

3    the phone numbers on the text list through this kind of banner

4    ad campaign, and that's how they got the numbers?  And then

5    they shot a text to those numbers?  I am just trying to

6    understand what exactly you think happened --

7              MR. SHAMBERG:  Well --

8              THE COURT:  -- in the relationship between the ad

9    campaign, the banner ad campaign, and this text campaign.

10             MR. SHAMBERG:  Well, if we're -- so if we're talking

11   about just what I think happened --

12             THE COURT:  What I mean is not -- I don't want you to

13   speculate as to what happened.  Based upon the evidence in

14   discovery in the case, what is your theory as to what happened?

15             MR. SHAMBERG:  My theory as to what happened is that

16   Ben Langille, every time he transfers a call to CCL and it

17   lasts for more than 30 seconds, CCL pays him between $3 and

18   3.50.  So, of course, it's incentivized to send as many

19   qualified candidates to CCL as he can.

20             One way to do that is to send out text messages to a

21   lot of people and hope that some of them are going to return

22   and call back and take up the offer.

23             Now, the reason -- and I'm not just speculating that

24   he did this.  The reason that I say that is the evidence in the

25   record of CCL throughout the class period repeatedly asking him

1   for opt-in information.  This is again in the brief.  You know,

2   where are the opt-ins?  Send in opt-in for this.  You need to

3   give us opt-in information.  We've been waiting for weeks.

4   We've been waiting for months for this opt-in information.  We

5   still don't have it.  And then when he does send it, it's

6   inaccurate.

7          So I think the evidence shows that these text messages

8   were being sent out to try to drive the campaign, and that

9   there was really no evidence that the other steps were being

10  taken.  And when asked for evidence if those other steps were

11  being taken, it was either delayed or was never provided.  Or

12  when it was provided, the information was not reliable.

13         THE COURT:  So do you know where Mr. Langille got the

14  phone numbers then?

15         MR. SHAMBERG:  No.  I would -- I could speculate, but

16  that's what I would be doing.

17         THE COURT:  And so, all right.  With regard to Mr.

18  Langille's declaration, right, plaintiffs have filed a motion

19  to strike the declaration.  The declaration was placed on -- as

20  I understand it, was put on the privilege log by the defendant

21  at the time.  And I know that there was some effort by the

22  plaintiff to try to depose Mr. Langille, get discovery from

23  Adsource's vendors to try to figure out what happened with

24  regard to the banner ad campaign, right, and the source of this

25  information.

1        MR. SHAMBERG:  In Jackson there was some efforts.

2        THE COURT:  Jackson.  Okay.

3        The privilege log was -- was that privilege log filed,

4    submitted, in this case or the Jackson case?

5        MR. SHAMBERG:  The Jackson case.

6        THE COURT:  And my understanding is that in the

7    Jackson case, the plaintiffs -- group of plaintiffs counsel in

8    that case did not either contest that entry in the privilege

9    log or seek to seek production of that declaration in the

10   Jackson case, is that correct?

11       MR. SHAMBERG:  Yes, that's true.

12       THE COURT:  And were you counsel in the Jackson case

13   as well?

14       MR. SHAMBERG:  I noticed an appearance and I took two

15   depositions.

16       THE COURT:  And so declaration was prepared for use in

17   the Jackson case, or --

18       MR. SHAMBERG:  I -- they would have to answer that

19   question.  I was -- it was a privileged document.  So I don't

20   know anything about it, Judge.

21       THE COURT:  Okay.  All right.  Thank you.

22       So, counsel, defendant, would you agree that if there

23   was evidence in the record that CCL had, in fact, sent texts to

24   let's say 200,000 people during the -- had engaged in a

25   campaign where it by itself or directed someone else to send a

1    text to 200,000 people between February 1 of 2014 and April 1

2    of 2015, and the case was a dispute as to whether or not there

3    was consent for those texts, then we would be dealing with

4    whether or not the consent issue predominates, or whether it

5    doesn't?  But we wouldn't be dealing with this issue about

6    whether or not there is an actual class here.

7              Would you agree with that?

8              MR. BACKMAN:  No, your Honor.

9              THE COURT:  Okay.  And why is that?

10             MR. BACKMAN:  Because when we are looking at this case

11   and what is -- what actually happened, what the evidence

12   actually shows, there is not a single other person that the

13   plaintiffs can provide evidence that they ever received a text

14   message.  And it's not just receiving a text message.  It's

15   receiving a text message from Adsource that has anything at all

16   to do with Caribbean Cruise Line.  And they cannot show that.

17   They haven't presented -- may I approach, your Honor?  I think

18   it's important they actually see the text message.

19             MR. SALAM:  Can counsel for the record state --

20             MR. BACKMAN:  It's Exhibit A to your complaint.

21   That's the text message that Mr. Gordon alleges he received.

22   There is not a single other text message in the record before

23   your Honor, not one.

24             So what they have done is, they've taken this list,

25   which was produced by Ben Langille, the president and owner of

1   Adsource, the company alleged to have sent these text messages.
2   He produced it.

3           In his transmittal e-mail he said:  This is a record
4   of people that opted in to get my telephone number because this
5   was an opt-in in-bound generation program.  These are people
6   who opted in on the landing page that's been provided with the
7   class cert papers, provided their telephone number, checked the
8   dialogue box, got a number to call me back.  That's what this
9   list is.  This is not a list -- he didn't say this, but it's
10  not a list of people who received text messages.

11          And so what they've done is, they extrapolated from
12  Mr. Gordon's testimony in this case, his testimony in this
13  case, that he didn't consent.  And, therefore, three entries in
14  this list related to Mr. Gordon are accurate.  They are
15  accurate because they help the plaintiff, supposedly.

16          But the rest that demonstrate his opting in online in
17  accordance with what Mr. Langille has testified by way of his
18  declaration occurred, that's all inaccurate.  And then they
19  went -- and we don't have a declaration from counsel, from a
20  paralegal or anybody.  But they supposedly went, maybe
21  randomly, maybe selectively, cherry-picked 50 additional
22  entries from this list, did some public record search that we
23  don't know about, and said, well, the names of these 50 people
24  that we, the lawyers, say are on this list, that we the lawyers
25  say the public records reveal something different, the

1    telephone numbers are correct but the rest of the information

2    doesn't match up.  And, therefore, Judge, all 200 and something

3    thousand people on this list, they all got text messages.

4            That is this case.  That is what they're arguing.  And

5    all that shows is, one, maybe Ben's opt-in list is unreliable.

6    None of us know.  None of us know.  We know what he told us.

7    We know what he sent to us.  We know what he said in an e-mail.

8    That's on the record in this case.

9            But let's just say it's unreliable.  Let's say their

10   theory is correct, another speculative theory.  That's all we

11   heard from Mr. Shamberg while he was up here.  Let's say it's

12   correct.  All it means is that the names on that list are

13   different than the names in the public records of 50 people.

14   It does not mean that a single additional person got a text

15   message.  It doesn't.

16           And even if they got a text message, it doesn't mean

17   they got a text message from Adsource that was related to

18   Caribbean Cruise Line, because there is two important points

19   there.

20           One, Mr. Langille's declaration at paragraph 3 says

21   that he marketed and sold generated leads to various third

22   parties, including Caribbean Cruise Line.  So we have no idea

23   whether all of the leads related to Caribbean Cruise Line,

24   whether all of the texts related to Caribbean Cruise Line.

25   Nobody knows.  They don't know.

1       And the only way that Mr. Gordon was able to associate

2  that innocuous text, which by the way doesn't mention my client

3  and doesn't mention a cruise, the only way he was able to do it

4  was by testifying at a deposition with my questioning that he

5  called that number back.  He spoke with somebody, answered a

6  couple of questions, got then transferred to somebody else.

7  And on that second transfer he asked who this is, and they said

8  Caribbean Cruise Line.

9       THE COURT:  So if we don't credit Mr. Langille's

10  declaration, okay?  And say that we don't believe him that this

11  chart is a chart that was manufactured or that was created by

12  people who consented.  And say we don't believe the names.  We

13  don't believe any of it.

14       What you're saying is that there is still no proof

15  that texts were actually sent to the phone numbers on that

16  list, let alone texts related to Caribbean Cruise Line.

17       MR. BACKMAN:  Correct.

18       THE COURT:  What about if you take the list and in

19  conjunction with the testimony from CCL about -- or testimony

20  with regard to the various complaints from customers regarding

21  texts, unsolicited texts, they received during that same

22  timeframe?  If you married those two things together, would

23  that be enough to satisfy plaintiff's burden on class

24  certification?

25       MR. BACKMAN:  No, your Honor.  First of all, I don't

1    know what those two things look like because what I heard from

2    Mr. Shamberg is reference to some e-mails that supposedly came.

3    They were complaints to Adsource, and that Adsource called

4    Caribbean.   I didn't hear anything and I haven't seen anything

5    in the record of another text that looks like that, to whom

6    that text was sent to, that is a telephone number to whom that

7    text was sent to.   So there is no way to marry those things.

8         I think what Mr. Shamberg is referring to because it's

9    what's included in their papers are some e-mails where it says,

10   there is a bunch of text messages happening here.   There is no

11   detail.   There is no call-back number like the 813 number there

12   that's supposedly associated with Mr. Langille.   There is zero

13   way to identify anything based upon the record that the

14   plaintiffs have developed and put in this court that matches

15   anybody else other than Mr. Gordon to this supposed text list.

16        And the theory that it's a text list is entirely made

17   up.   It's pure conjecture because Mr. Gordon disputes his

18   consent, which brings us back to the predominance issue on

19   consent.   And --

20        THE COURT:   Let's talk about that.   So Mr. -- one of

21   the main problems here factually is that Mr. Langille has not

22   been subjected to discovery in this case, right?   Like he

23   hasn't been deposed ever, has he, either in the Jackson case or

24   this case?

25        MR. BACKMAN:   No, your Honor.   I can get into that.

1   They never tried to go through a proper legal process.

2            THE COURT:  They have to go through The Hague to get

3   him from Canada?

4            MR. BACKMAN:  They could have gotten -- it's not that

5   hard to go through the Canadian justice system.  But they could

6   have gotten letters rogatory issued in the Jackson case, gone

7   over to Halifax.  There were e-mail communications that they

8   were party to, including Mr. Shamberg and Mr. Ismeal -- I am

9   sorry -- Mr. Salam in the Jackson case, where I on their behalf

10  was sending him their requests.  And he was actually

11  responding.

12           And all they ever did in that case was try to issue a

13  subpoena to him out of the court in New York and then never

14  followed up.

15           THE COURT:  So if -- let's assume for the purpose of

16  argument that that class was tentatively certified, right?

17  Without Mr. Langille how would you establish consent?

18           MR. BACKMAN:  Well, I have my client who has testified

19  under oath several times as to what this -- what this program

20  was intended to be.  I have a list that Mr. Langille has

21  demonstrated through his correspondence is an opt-in list.  And

22  we get that information, and then we go through it with each of

23  the individuals who claim to have received a text message.  We

24  have the landing page.  We have all of the information with

25  respect to what this opt-in program looked like.

1         But I also don't know who's to say that Mr. Langille

2 doesn't end up testifying at trial. I don't know why -- if I

3 wanted him there to demonstrate the issues of consent, I would

4 try to go through the proper legal means that they never did.

5         But if they go first, Judge, that's what's important

6 here. Let's go back to the basics. We got our basics in law

7 class in the back there. They have the burden of proof on

8 class cert. It's a preponderance of the evidence standard. It

9 requires a rigorous analysis. And they're coming to you with

10 nothing for you to even analyze, let along rigorously analyze.

11         THE COURT: So, Mr. Shamberg, if you would step up.

12         So why is it that Mr. Langille was never deposed in

13 either the Jackson case or in this case?

14         MR. SHAMBERG: As to the Jackson case, I really can't

15 answer that, Judge.

16         THE COURT: You weren't lead counsel in that case.

17         MR. SHAMBERG: I am still an associate. I was an

18 associate then. One day I will wield more power than I do

19 today. So I did what I was told in that case.

20         THE COURT: That is the hope, right?

21         MR. SHAMBERG: Yes. Hopefully. That may be

22 speculation now as well.

23         But in this case, it was really because we looked at

24 the record that we had, and we felt that it was sufficient for

25 class certification. And, you know, we had already heard your

1    Honor's ruling that we didn't want to have non-duplicative --

2    or only non-duplicative discovery.  We could tell, we wanted to

3    limit it.  The case had been sitting here for a while.  And we

4    wanted to get this class certification motion on the record at

5    the earliest practicable time.

6           And we felt and still feel that a class should be

7    certified without getting deposition testimony from Mr.

8    Langille.

9           THE COURT:  So given the fact that the text list is so

10   central to the issues in this case, not only to the scope of

11   the class, the class definition, but also the issues of

12   predominance because in order to -- for the issue of consent to

13   defeat the class certification on predominance or counter-

14   class certification on predominance there has to be some

15   arguable evidence of consent, right?  And there is a dispute as

16   to whether or not this constitutes arguable evidence, mostly

17   because the declaration of Mr. Langille and what it may mean.

18          Why wouldn't it be prudent, so that we can actually

19   get down to the bottom of what happened, for me to reopen

20   discovery, given the fact that the declaration of Langille was

21   just attached to a response to the motion for class

22   certification, and allow plaintiffs to go out and depose him?

23   Then we will figure out what happened.  We'll figure out what

24   these lists mean.

25          Given the unexpected, I guess that's the right word

1    for it, inclusion of a declaration of Mr. Langille to the

2    response, that would address whatever prejudice of surprise

3    plaintiff claims they had with regard to the declaration.  Why

4    wouldn't that lead to a better record, whether on appeal or

5    otherwise, and just a more just and just and fair resolution to

6    the issues in this case?

7         Let me hear --

8         MR. SHAMBERG:  I would say, you know, that's a maybe

9    letting the perfect become the enemy of the good scenario here.

10    You know, there is certainly more discovery we can take.  There

11    is more information that we could get.  I have said and I still

12    believe that we don't need it in order to meet the class

13    certification standard here.

14         With that said, if that's what your Honor ordered,

15    we'd obviously do that.  The only issue that I would raise is

16    that it appears as though at some point Mr. Langille moved to

17    Bogota, Colombia, where he may or may not be now.  And as a

18    Canadian national living in Bogota, Colombia, it's not clear

19    that we would be able to get jurisdiction over him for a

20    deposition.  But that is unclear right now.

21         MR. BACKMAN:  Your Honor, that would then be their

22    third bite at the apple.  I'm not sure if you recall all the

23    status conferences we've had in front of you on a sort of

24    90-day basis going back to Jackson.  I'm not sure if you took a

25    look at the timeline of events that occurred in Jackson that

1    are provided with our papers.

2           They have had chance after chance after chance.  There

3    were half a dozen or so orders from the magistrate in New York

4    saying, guys, I'm not going to tell you what to do here, but

5    you got to do something.  Go get Adsource.

6           Mr. Langille and Adsource were disclosed in our

7    initial disclosures back in July of 2014 in the Jackson case.

8    He was named as a defendant -- his company was named as a

9    defendant in the second amended complaint in that case.  They

10   tried to get a default.  They didn't do it right.  The

11   magistrate told them.  They tried to compel discovery.  They

12   didn't do it right.  The magistrate told them.  They tried to

13   get it through me and get sanctions.  Not happening.  The

14   magistrate told them.

15          Mr. Shamberg and Mr. Salam are trying to down play

16   their role in Jackson.  They entered appearances in I believe

17   April of 2015.  It was before I even provided that privilege

18   log where in all caps it says, declaration of Benjamin

19   Langille.  They are copied on the correspondence with the New

20   York lawyers that were handling Jackson.

21          Mr. Shamberg and Mr. Salam are e-mailing me directly

22   during that same time period coordinating the deposition, the

23   only defense deposition that took place, where they are the

24   ones, these two lawyers here, came down to Florida and took my

25   client's depositions.

1    They're copied on e-mails, where Ms. Hardy, the lawyer

2  in New York, is saying, well, where are these, you know 60

3  documents that -- why aren't they in your production?  And I'm

4  responding to all of the lawyers and saying, they are on my

5  privilege log.

6    Nobody ever moved to compel that privilege log.

7  Nobody ever exercised the remedy of 26 what is it (b)(3), which

8  is my right to put it on the log.  It's their right to come

9  back and say, look, we can't obtain the substantial equivalent

10 without undue burden.

11    You know why they didn't file it in Jackson?  Because

12 the magistrate just railed them on their inability to do

13 anything correct with respect to trying to get something from

14 somebody in Canada.  And they would have lost because they

15 wouldn't have made -- met their burden.

16    We then came back to this Court after I contested

17 Jackson's request to voluntarily dismiss this case.  I wanted

18 the Judge to say, no, you can't.  You got to pay these lawyers.

19 You got to pay this client for all the attorney time spent

20 litigating this case for two and a half years.

21    We came back to your Honor.  Your Honor lifted the

22 stay, told the parties to talk about what other discovery they

23 might want.  In the status report Mr. Shamberg and Mr. Salam

24 put in there, one, they might challenge privileged documents.

25 Two, they might want to go take or do additional discovery of

1    Adsource.  They never did that.

2            They filed their class cert motion by the deadline

3    that the Court set.  They didn't ask you for more time.

4    They -- when they got my -- my response with the declaration --

5    which by the way all the case law says that I can do exactly

6    what I did.  This wasn't a failure to disclose here.  But

7    nonetheless, they got that response.

8            Did they file a motion for more time?  Did they file a

9    motion to compel under 37 or 26(b)(3) at that point to say, we

10   can't get this stuff?  We need it.  We need more.  What else do

11   you have?  No.  In fact, in their reply they say, we are going

12   to reserve our right on that motion-to-compel thing.  We want

13   it excluded.

14           So we didn't do anything to build the record.  And I

15   combine it all.  Three -- three and a half years almost in

16   these text cases we did nothing to build a record beyond the

17   speculation that they are providing to the Court today.  And

18   now we're going to give them more time?

19           I don't think that that's the just result here.  I

20   think they had their chance.  They chose not to exercise it.

21   And by Mr. Shamberg's own words -- I don't know how long I've

22   been ranting, but by his own words before I spoke just now, he

23   said, we think we have enough.

24           I don't think they do for the reasons we articulated.

25   And I don't think they should be given yet another chance to go

1   through this process.

2         THE COURT:  Mr. Shamberg, I'll give you the final

3   word.

4         MR. SHAMBERG:  I'll try to be a little more concise.

5   First, I would just say that I -- I don't feel it's proper to

6   have this plaintiff prejudiced by the litigation strategies of

7   lead counsel in the Jackson case.

8         Secondly, we -- you know, Mr. Langille, his deposition

9   is not necessary to determine if class certification is proper

10   here.  If anything, it may go to some questions on the merits

11   with respect to, say, the use of an ATDS, something like that,

12   that may be appropriate for summary judgment.  But in terms of

13   meeting the requirements of Rule 23 --

14         THE COURT:  You think you have enough.

15         MR. SHAMBERG:  We think we have enough.

16         THE COURT:  Okay.  On that note, I want to thank the

17   attorneys for coming today.  And we will take the motion under

18   advisement.

19         MR. SHAMBERG:  Thank you, your Honor.

20         MR. BACKMAN:  Thank you, your Honor.

21     (Which were all the proceedings heard in this case.)

22

23

24

25

CERTIFICATE

I HEREBY CERTIFY that the foregoing is a true, correct and complete transcript of the proceedings had at the hearing of the aforementioned cause on the day and date hereof.


/s/Alexandra Roth                                    10/6/2017
_____      _____
Official Court Reporter                          Date
U.S. District Court
Northern District of Illinois
Eastern Division